STATE OF IOWA, Appellee, v. RAY KESSLER, Appellant.

**RAPE:** Corroboration—Designedly Planned Opportunity. Evidence
1  tending to show that the accused designedly planned the opportunity to commit a rape, the commission of which is properly shown, may furnish the required corroboration.

**WITNESSES:** Character Witnesses—Cross-Examination. A defend
2  ant who, instead of confining his good-character witnesses to the trait involved in a charge of rape, questions them, without objection by the State, as to his character for (1) morality, (2) decency, and (3) character, may not complain if the State cross-examines as to defendant's (1) drinking habits, and (2) whether they had heard of defendant's wife's securing a divorce for cruelty and drunkenness, when the record reveals (a) that, in some instances, no objections were made, (b) that, in other instances, the objections were indefinite, and (c) that the error points on appeal were quite delayed.

EVANS, J., concurs.

WEAVER, C. J., concurs specially.

LADD and GAYNOR, JJ., sustain the examination, on the ground that, inasmuch as defendant saw fit to enter into the broad, ·general field of morality, decency, and character, the State had a right to follow, in like manner, by cross-examination.

SALINGER and STEVENS, JJ., dissent, generally.

*Appeal from Pottawattamie District Court.—J. B. ROCKA-*
*FELLOW, Judge.*

JULY 20, 1920.

. THE defendant was charged with the crime of rape upon Flossie Hogaboom, who was 13 years of age. He was tried and convicted. He appeals.—*Affirmed.*

*W. H. Killpack* and *Thomas Q. Harrison,* for appellant.

*H. M. Havner,* Attorney General, *C. E. Swanson,* County Attorney, and *F. E. Northrop,* Assistant County Attorney, for appellee.

PRESTON, J.—1. The point most relied upon by appellant for a reversal is the alleged insufficiency of the statutory corroboration of the prosecutrix. It was claimed by de-

1. RAPE: corroboration: designedly planned opportunity.

fendant, all through the trial, that there was no sufficient corroboration. Motions were made, at the close of the State's testimony and at the close of all the testimony, to direct a verdict for the defendant. These motions were overruled. We shall not go into the evidence in detail as to the transaction itself and the corroborating circumstances tending to show that a crime was committed by someone. We do not understand appellant to contend that the evidence is not sufficient to show that the crime was committed. The crime may be established by the testimony of the prosecutrix alone. There may be, of course, two kinds of corroboration. One kind is that her clothes were bloody. and that she could not sit down for some days, and medical testimony as to the rupture of the hymen, and so on. The other kind is that under discussion, wherein, under Code Section 5488, it is provided that a defendant cannot be convicted upon the testimony of the person injured, unless she be corroborated by other evidence, tending to connect the defendant with the commission of the offense. It is not required that the act itself, or the details and circumstances, be witnessed by some other person, but there must be other evidence than that of the prosecutrix, tending to point out the defendant as the person who committed the crime which the jury may find, from the testimony of prosecutrix, was committed. If

the crime was committed by someone, and there was no other person present who could commit it, and it was shown by evidence other than that of the prosecuting witness that defendant was. present, and that no° one else was, it could not, of course, have been committed by anyone other than · such defendant. In other words, it would be impossible to commit the offense, without the opportunity to do so. In *State v. Stevens,* 133 Iowa 684, 686, we said:

"It affirmatively appeared, however, from the testimony of others than the child, that the accused was the only person in the house at the time, capable of committing the act. This, in connection with the immediate circumstances corroborating her testimony that the crime was committed at that time, was proof of something more than mere opportunity; for, by excluding the possibility of anyone else having committed the offense, and confirming the child's story that it was then committed there under the circumstances, tended to single him out as the real perpetrator."

It has been held repeatedly, however, that mere opportunity is not, of itself, sufficient corroboration. This is doubtless on the theory that a man and woman are very often, in the ordinary, everyday affairs, and under proper and innocent circumstances, alone together. It is appellant's contention that the evidence of witnesses other than prosecutrix, which is relied upon by the State, shows no more than mere opportunity. It has been often held, however, that, if the opportunity was of defendant's creation, and made with apparent deliberation, such circumstances should be considered in determining whether or not defendant is the guilty party. *State v. Crouch,* 130 Iowa 478; *State v. Lindsay,* 161 Iowa 39, 44; *State v. McGhuey,* 153 Iowa 308; *State v. Waters,* 132 Iowa 481; *State v. Bricker,* 135 Iowa 343; *State v. Norris,* 127 Iowa 683; *State v. Powers,* 181 Iowa 452; *State v. Ralston,* 139 Iowa 44; *State v. Stevens,* 133 Iowa 684. In the instant case, the State relies upon the testimony of the brother of prosecutrix, and some other circumstances, to show statutory corroboration; and it contends that the testimony of the brother corroborates

the testimony of his sister, the prosecutrix, and shows that defendant took the little girl to his room, to create the opportunity to commit the crime which the prosecutrix says was then and there committed. The principal item of evidence- relied upon as corroboration is that of the brother, wherein he states that defendant told him to stay at the gate, while defendant and prosecutrix went to defendant's room.

It appears from the testimony of the prosecuting witness that, at about 4 o'clock on the afternoon of the day in question, prosecutrix, in company with her 10-year old brother, Richard, and her cousin, a girl about the size of Flossie, met defendant near defendant's residence, and defendant told Flossie to come up to his room; that he wanted to give her her brother's picture. Her brother had gone to war, and she and her parents knew that defendant had the picture. Richard went with Flossie as far as the gate. Defendant lived upstairs. Flossie then accompanied defendant to his room, and Richard remained at the gate, or yard, as he was requested to do by the defendant. After defendant and the little girl got into the room, defendant got the picture of her brother, but did not give it to her immediately, but put it in his pocket, and told Flossie to lie down on the bed in the room. According to her testimony, the rape was then committed. We shall not go into the details, except to say that she testifies that she complained that it would hurt, and that he told her it wouldn't hurt, and not to tell anybody. She describes some of the furniture in the room. a brass bedstead; and witnesses other than Flossie testify thereto. She estimates that she was on the bed, in the position described, for about five minutes. After the transaction complained of, defendant accompanied prosecutrix to her home, where she lived with her parents, about a block distant. He went ahead of her, and she followed. After reaching the Hogaboom home, defendant observed that Flossie had some small change, and asked her how much she had, and told her to give that to him, and he gave her a dollar. This was in the presence of her father, mother,

brother, and sister-in-law. That evening, the mother testifies, she noticed blood on Flossie's skirt, and the girl told her it hurt her to sit down.

The brother testifies that he remembers being at the place indicated by his sister, and with her and his cousin; that he saw defendant there; that witness went just to the gate, then defendant told him to stay down; that defendant said he had a picture of the brother, and told Flossie to come and get it; that defendant said it was up at his house; that the boy stayed down; that they went up into the house; that witness was down by the gate.

The jury may well have found that the opportunity for intercourse was created or manufactured by the defendant, under suggestive circumstances, and that his purpose in asking the boy to stay outside at the gate was for the purpose of having intercourse with the girl. It occurs to us that he could have had no other purpose. If he was only wanting to get the picture for prosecutrix, and his purpose and intention were innocent, there could be no object or reason for not wanting the boy present. The picture was that of the boy's brother, as well as Flossie's, and there would appear to be no reason why the boy should not have gone with defendant and the little girl. We shall not discuss the other circumstances relied upon by the State. The matter referred to was properly corroborative, and we think it was sufficient for the jury. This disposes of the principal point in the case.

2.  Some of the instructions are complained of, but they were not excepted to, and this is conceded.

3.  Defendant called five or six witnesses as to defendant's good character. The questions were not framed so as to call for any specific trait of character. Some of the witnesses say that they were acquainted with his general reputation as to morality and decency. Some say it was good, so far as they knew; others that it was good. One witness says he knows his reputation as to general morality and character. It seems to us that the questions in this

2.  WITNESSES:
character
witnesses:
cross-examination.

form were somewhat broader than such questions are usually propounded, in regard to general moral character or reputation for morality. No objection was made, however, by the State, as to the form of the questions. These witnesses were cross-examined by the county attorney, in regard to his drinking habits and associations, and as to whether they had heard that defendant's wife obtained a divorce from him on the ground of intoxication and cruel treatment. One of them says he understood that defendant's wife got a divorce, but never heard the grounds. It is thought by appellant that this was misconduct on the part of the county attorney. In appellant's original argument, there is no brief point or proposition or assignment of error in regard to this. There is a reply argument, an additional argument, and an additional abstract, filed for appellant. In a later argument, the matter is sought to be raised. The matter complained of was not even set out or referred to in the abstract. This question is not argued by the State, or even suggested in its argument. We assume that the reason for this is that it was not raised in appellant's argument or abstract. We think the rule contemplates that the errors or points relied upon shall be disclosed in the opening or original argument, rather than that the abstract and argument may be prepared on one theory, and then, if appellee's argument has been made, an additional abstract and argument and assignments of error, or points, filed. That would certainly be no more than fair to an appellee. Whether this is proper procedure, we need not determine, because of matters which will be now referred to. It may be that it would have been better had the county attorney not pursued this method of cross-examination. We do not know what was in his mind. He is not confined, on cross-examination, to the exact questions asked in chief. Some latitude might be given, in cross-examination of character witnesses. He may have had information in regard to the matters inquired about, and may have proceeded on the theory that the witnesses had knowledge thereof, and that, if they did, it might qualify their opinion

as to his character. Whether specific acts may be inquired about on cross-examination, we need not determine, though the writer has his own idea about it, that a person's character is judged by his life conduct, and should be so. Aside from all this, there was no repetition of questions after adverse rulings by the trial court, and no defiance or persistence in repeating questions after such rulings. The answers of the witnesses to the questions propounded by the county attorney were. to the effect that they did not know, and had not heard of the matters inquired about. In *State v. Tippet*, 94 Iowa 646, 651, it was held that, where such answers were in the negative, and no improper evidence was elicited, the mere asking of the questions was not prejudicial; and further, that such answers were really in defendant's favor. In that case, the questions were asked over objection. In the instant case, there was no objection to any of the questions propounded by the county attorney, as to any of the matters inquired about, of which complaint is now made, except in one or two instances, which will be now stated. In the cross-examination of the first of the character witnesses called, there was an objection to the last question asked, and this was in regard to the obtaining of a divorce by defendant's wife, on the ground of drunkenness and cruel treatment; and the witness answered that he understood she did get a divorce, but had never heard the grounds. This and one other are the only objections on the subject complained of, in all the evidence of all the witnesses. Near the end of the testimony of the next character witness, this question was asked:

"Q. Defendant was quite friendly with Sam Christensen this summer?

"Mr. Hess: Objected to as not cross-examination.

"Court: I take it that is preliminary. You may answer."

There was no other objection to any question propounded to this witness. (The first witness had testified before, and in the same cross-examination, and without objection, in regard to defendant's drinking habits.) The

next witness, after testifying at some length, was asked in regard to the acquaintance and associations of witness with the defendant, and was further asked:

"Q. That was just because you happened to live on the way to his home from the lodge room? (Objected to as argumentative, incompetent. Overruled.)"

The same witness was asked as to the divorce, and the objection was that the testimony was incompetent, irrelevant, immaterial, and not a fact, and that the decree does not so show. The witness answered, "No." These two objections are the only ones made to the testimony of the witness just mentioned. To the next two witnesses, there was no objection whatever.

To my mind, it is unbelievable that a jury, acting as such under oath, could have ignored the testimony given on the trial, and decided this case upon these matters, or that there was any prejudice to the defendant. Counsel for defendant seem not to have considered it of enough importance to even refer to it in their abstract filed in this court, or in their original argument.

We discover no prejudicial error, and the judgment is, therefore,—*Affirmed.*

EVANS, J., concurs.

WEAVER, C. J.—I concur in the conclusion that the judgment be affirmed, but wish to say that, in my opinion, the testimony discussed by Mr. Justice Salinger in his dissent should have been excluded. In view, however, of the record as a whole, I cannot believe that the error in its admission is of a character to call for a reversal.

· LADD, J. (concurring.)    Aside from evidence tending to show the improbability of prosecutrix's having been in defendant's room at the time fixed by her, the accused relied on proof tending to establish his character as a man of morality and decency. He called Nelson, Still, and Leffert, of whom he inquired as to his general reputation for mor-

ality and decency, and Conway and Smith, of the first of whom he asked as to his general reputation as to morality, and of the last as to his reputation for morality and character. All answered that his reputation as to matters mentioned was good. Manifestly, the inquiries covered a broader field than the trait involved, and, on appropriate objection, the evidence must have been limited to his reputation with respect to character in the sexual relation, on the theory that he was not the kind of man likely to commit the offense charged. But no objection was interposed by the State; and, counsel for the accused having opened the field of inquiry as to general reputation for morality, decency, and character, cross-examination covering this field was legitimate, and not beyond what the court, in the exercise of a sound discretion, might properly have permitted. No one would pretend but that excessive drinking, carousing, bootlegging, having had a divorce obtained on the grounds of drunkenness and cruel and inhuman treatment, would have a direct bearing on his character for morality and decency. As he was represented by a lawyer of learning and ability, there is no occasion for injecting into the record a limitation on his questions, or a construction thereof not appearing therein. It may well be assumed that, for some reason, believed by him to be helpful to the defense, he chose not to limit his inquiries to the trait involved, and, not having done so, appellant is not in a situation to complain of the State's action in following him into the same field of inquiry he had opened. Such has always been the rule. In my opinion, there was no abuse of discretion on the part of the trial court in permitting the inquiries on cross-examination, nor prejudice to the accused, in view of the nature of the questions and the negative answers. I am for affirmance.

GAYNOR, J., concurs in the above.

SALINGER, J. (dissenting). The defendant was charged with a sexual crime. He produced witnesses who testified

that his general reputation "as to morality and decency" was good. It is manifest that the reputation spoken to was as to sexual morality and decency. On cross-examination, one of these witnesses, Still, testified that he knew one Sam Christensen. He was then asked, "This defendant was quite friendly with Sam Christensen this summer?" to which defendant objected that it was not cross-examination, and as to which objection the court remarked, "I take it that is preliminary,—he may answer." The witness was then asked whether he had ever heard it rumored that defendant and Christensen were engaged in any bootlegging operations, or in dealing in whisky, and whether he had ever heard, during the past summer, that defendant was drinking quite a little whisky. Conway was asked whether he had ever heard defendant was indulging in the use of intoxicating liquor, and whether he had ever heard that he was carrying around a considerable quantity of liquor, a number of bottles, during the summer of 1918, and whether he had heard that defendant was suspected of bootlegging, in the summer of 1918. Loseth was interrogated on whether he had heard that defendant had indulged in the use of intoxicating liquors quite freely; whether he had heard that he was suspected of bootlegging during the last summer. One question to Nelson was: "Isn't it a fact you have heard some remarks about his drinking quite a bit and carousing around, while he was working at the Northwestern?" It was inquired of Leffert whether he had ever heard that defendant was or had been an habitual drunkard; whether he had heard of his indulging freely in the use of intoxicating liquors in the summer of 1918, or heard that he was suspected, by officers and others up in the Northwestern yards, of bootlegging in that community, and whether he had ever heard he was mixed up with Christensen in the bootlegging business, and that the liquor was kept at Christensen's house.

It is the fact that no objection was interposed to most of these inquiries. But the practitioner will instantly appreciate the dilemma of defending counsel. True, failure

to object might deny appellate review. But counsel could not be certain of a reversal, even if objection was made. On the other hand, the odious nature of the accusation had a natural inflammatory tendency. And while the counsel could not feel sure of the benefit of objection, he might well fear the effect objecting would have upon the jury. And experience teaches that this persistence in this line of inquiry filled the atmosphere of the trial with a prejudice which neither objecting nor sustaining of objections could remove.

Moreover, the record discloses that objections would have been futile; for, as has been and will be shown, they were overruled when they were interposed.

### 1-a

Loseth was asked whether he ever heard that, in 1914, a petition for divorce was filed against defendant by his then wife, which charged him with cruelty and habitual drunkenness, and whether he had heard that she had later got a divorce. Smith was questioned to like effect; and Leffert. Conway was cross-examined as follows:

"Q. Did you ever hear that his wife at that time, got a divorce from him, on the ground of cruel and inhuman treatment such as to endanger her life, and on the further ground of habitual drunkenness?"

Defendant objected that this was incompetent, irrelevant, and immaterial; that it was not a fact; and that the decree shows no such thing. The court overruled the objection, with the statement: "It isn't a question of what the decree shows; it is a question of what this witness heard." The answer was "No." Thereupon, he was asked again:

"Q. Did you ever hear that his wife, in 1914, filed an application for divorce, in which she set up the claim that he was guilty of cruel and inhuman treatment towards her, such as to endanger her life, and also habitual drunkenness?"

It was objected that this was incompetent, irrelevant, and immaterial, and the objection was overruled.

"Q. Did you ever hear that she subsequently got a di-

vorce from the defendant in that action? A. I know he was divorced from that woman; yes, sir, I heard it."

Nelson was asked:

"Did you ever hear that his former wife got a divorce from him, in September, 1914, on the charge of habitual drunkenness and such cruel and inhuman treatment as to endanger her life?"

This was objected to as incompetent, irrelevant, and immaterial, not the best evidence, not cross-examination. The objection was overruled, and the witness answered: "I understood she got a divorce, but I never heard on what grounds."

II. It was persistently put before the jury that defendant had the reputation of drinking and bootlegging and consorting with bootleggers, and that he was an habitual drunkard; persistently put before it that his wife had asked a court to divorce her because defendant was an habitual drunkard, and guilty of treating her with such inhuman cruelty as to endanger her life. This last line of testimony and some of the other was permitted despite objection. First, the jury was thoroughly inoculated with the drinking and bootlegging tendencies of the defendant. Then the rulings of the court added that, in its opinion, this, and the reputation that the wife had filed such a divorce petition, and that she had obtained a decree, tended to impeach the testimony of witnesses who said that defendant had a good reputation for sexual morality and decency. It seems to me to be manifest that the overruling of these objections constitutes error. And from error, prejudice is presumed. And I have attempted to set out what shows that the presumption is well founded. I am abidingly convinced that permitting this line of inquiry wrongfully deprived the defendant of the weight justly due the testimony supporting his good character. I must not be understood, however, to argue that a character witness may not properly be cross-examined as to what he has, in fact, heard concerning the reputation to which he has spoken. Observing relevancy, the witness may be interrogated on whether it has not been

generally reputed in the community that the defendant has done disreputable things. We said, in *State v. Rowell*. 172 Iowa 208, 214, that such examination is permissible because it bears directly on the value of the testimony in chief; that there is no reason why the jury may not be advised that a witness who said the general reputation of defendant in certain respects was good, was so testifying when, in fact, the community was rife with reports indicating the contrary; that such testimony tends to show, either that the witness is unfamiliar with the reputation to which he has testified, or that his standards of what constitutes good repute are unsound; that it founds an argument that the witness either was in ignorance of defendant's reputation or that he testified in disregard of what he did know. Such examination is permissible to test the conception of the witness as to what is good character, and bears on his credibility or accuracy (40 Cyc. 2496-7), and to ascertain the foundation for his opinion, or the data from which he draws his conclusion, with a view to lessening the effect of his testimony as to general reputation (*Basye v. State,* 45 Neb. 261 [63 N. W. 811]). In *Annis v. People,* 13 Mich. 511, it was said that such examination is permitted to enable the court and jury to determine whether the impeaching witness in fact knows the general reputation of another, and, if so, whether he has testified truly in regard to it. Making concrete application, then, it was proper to inquire of these character witnesses whether it was not generally reputed, or even whether they did not in fact know, that defendant had been guilty of sexual immorality and indecency. Were the charge larceny, it would be proper to inquire what the witness knew, or knew to be generally reputed, as to defendant's character for honesty. But this honesty is irrelevant where sexual morality is in issue, even as reputation of being a sexual pervert would not negative a reputation for honesty in business dealings. It is a truism to say that the cross-examination must be relevant, and equally a truism to assert that the examination permitted here was irrelevant.

True, the special concurrence asserts that appellant cannot object, because, when he put in testimony that he had a good reputation for morality and decency, he opened the door so wide as that the cross-examination was relevant and permissible. Manifestly, this begs the entire question. It assumes, and I think erroneously, that the morality and decency testified to were general. It seems to me to be manifest that, where the charge involves sexual immorality, the inquiry is limited to such morality or lack of it. It follows that the cross-examination was erroneous, because bootlegging, drunkenness, or giving cause for a divorce on account of cruel and inhuman treatment, do not negative sexual morality.

As to another argument, to the effect that, where guilt is so clearly proven that, though there was error, there is no prejudice, I have this to say: There was a flat conflict. There was testimony as to good character, and no one may say that utterly conclusive proof overcomes the presumption that error is prejudicial. Had this been a suit for damages, based on alleged rape, and had a jury found for the defendant, no court would have set the verdict aside on the ground that it was not sufficiently sustained by evidence. And we held, in *Cram v. City of Des Moines*, 185 Iowa 1292, that, even as to a defendant in a civil suit, we could not hold that the record showed a cure of the error, because of conclusive evidence of negligence on part of the plaintiff. If that must be held in a civil suit, and against one who has no burden, surely, the State, which had the burden of showing guilt beyond reasonable doubt, may not say in this case that it has so overwhelmingly met its burden as that the state of the evidence has overcome the presumption of prejudice arising from the commission of error.

I would reverse, and am authorized to say that Mr. Justice Stevens concurs in this dissent.